[Civ. No. 139. Fourth Appellate District.—November 24, 1930.]

DORA WOOTON et al., Appellants, v. WM. G. McADOO et al., Respondents.

NETTIE L. SEEGER et al., Appellants, v. WM. G. McADOO et al., Respondents.

50

Ewell D. Moore and D. A. Knapp for Appellants.

McAdoo, Neblett & Clagett and B. H. Neblett for Respondents.

BARNARD, J.—These two actions were consolidated for trial and from a judgment entered as applying to each case, this appeal is taken.

The plaintiffs in each case are the owners of a lot twenty-five feet wide and fifty feet deep, on the outskirts of the Huntington Beach oil-field. The two lots adjoin, and taken together, formed a unit of land large enough to hold a derrick for drilling, but not of sufficient size to hold such a derrick and also the boiler and other equipment necessary to operate the same. The defendants in these two cases were the owners of a lease upon another lot situated 117 feet from the lots owned by these plaintiffs, upon which

they drilled what is referred to in the lease contracts here in question, as the first well. The defendants undertook to lease the two lots separately owned by the plaintiffs, and to drill for oil thereon by using power brought from their power plant installed in connection with the first well. The first lease with plaintiffs Wooton was signed on July 24, 1926, and a second or substitute lease with the same plaintiffs was signed on September 28, 1926. The lease with plaintiff Seeger was signed on August 6, 1926. Each of these leases referred to the above-mentioned first well, and then to a second well to be drilled upon the lots owned by these plaintiffs. Neither of the leases contains any provision as to when the first well is to be commenced or completed, but each lease provides that the second well is to be commenced after the discovery of oil in paying quantities in the first well, and thereupon, the lessees are "to commence drilling operations within ninety days thereafter and continuously operate one string of tools until said second well has been drilled with due diligence to a depth of 4,000 feet unless oil in paying quantities is discovered at a lesser depth". Each of the leases also contains the following provision: "The lessee may at any time before discovery of oil on the demised premises quitclaim the real property or any part thereof to the Lessor, his successors or assigns, and thereupon all rights and obligations of the parties hereto one to the other, shall thereupon cease and determine as to the premises quitclaimed."

Each of the leases provides for a royalty to the lessor of a certain percentage of the oil that might be produced from the second well, together with a bonus of a percentage royalty interest in the first well. As such bonus, out of the proceeds from the first well the plaintiffs received over $4,100. The defendants subleased the property to one Cather, and thereafter, Cather, together with defendants and their respective wives, made another sublease to one Fred W. Roberts. Roberts entered upon the property and sunk a well theron to a depth of 400 feet, when the work was abandoned. The court found that the work was abandoned for the reason "that prior to the time that the respective leases required the defendants to drill and complete the well on the leased property, the field had been

intensively drilled by other operators and the oil supply therein practically exhausted''. These actions were filed, seeking to recover damages for alleged breach of agreement in failing to drill on time, and also for alleged misrepresentations. After a trial before the court without a jury, judgment was entered in favor of the defendants, and this appeal followed.

Each complaint sets forth five causes of action. A motion for a nonsuit was granted as to the fourth cause of action. No appeal followed that order, leaving four causes of action to be considered here.

The first cause of action is for damages for failure to use due diligence in carrying on drilling operations to a depth of 4,000 feet. Appellants point out that when the Wooton lease was signed on July 24, 1926, it referred to the property on which the first well was located, saying: ''Operations for drilling an oil well have already been commenced thereon.'' It is pointed out that there was evidence that it took sixty-four days to complete the first well, that it was spudded in on September 12th and brought in November 15th. It is then argued that had the first well been started on July 24, 1926, as represented by the clause in the lease last above quoted, this well would have come in by September 26, 1926. This is the first breach of contract relied upon. Not only does it appear that it required both of these lots to make room for the installation of a derrick and that the Seeger lease was not signed until August 6th, but we are unable to put any such interpretation upon the contract. To say that operations for drilling an oil-well have already been commenced, is far from an assertion that drilling has already been commenced. Many things are necessary to be done in getting ready to drill an oil-well. The contract is silent as to when the first well was to be begun. If, as argued by appellants, it is a necessary implication that the first well was to be drilled and completed as soon as possible, nothing appears herein to indicate that the beginning of actual drilling on September 12th was an unreasonable delay.

With the assumption that the first well should have been completed on September 26, 1926, it is next argued that the second well should have been begun immediately thereafter, and that the same would have been completed

in sixty-four days, or by December. 27, 1926, at the latest. The argument is made that the real intention of the parties was to provide that the second well should be drilled as soon as the first one came in; that the ninety-day period for commencing the second well was intended to apply only in the event the production in the first well should be so small that such time would be required to determine whether or not it was a paying well; and that it is necessarily implied by law that when the first well came in with a good production, the lessees did not have the ninety days provided for in the contract within which to commence drilling the second well. To state this contention is almost to answer it. Not only does the contract govern, but it is self-evident that it requires some time to assemble sufficient equipment to drill an oil-well. Even if we could discard the contract and apply the reasonable time rule, we are unable to say that ninety days was an unreasonable time, in the absence of any evidence upon that point.

That the work on the well was later abandoned because production in surrounding wells decreased to an extent that made drilling seem unprofitable, is undisputed. Appellants' cause of action is based upon the theory that the delay of respondents in drilling deprived them of an income that would otherwise have been available before this portion of the field became depleted. By the reasoning referred to, it is insisted that the second well should have been brought in by December 7, 1926. Appellants quote a witness as giving the opinion that a well on their lots would have been profitable until February, 1927, and that in May, 1927, an average production of 100 barrels a day from such a well could have been expected. Reference is also made to a number of surrounding wells, which are said to have been brought in successfully in January, 1927. Based upon production in some other wells, appellants estimate that they would have received from the second well over $11,000, between December 7, 1926, and October 31, 1928. It was stipulated that the second well was begun within ninety days after the completion of the first well, which is all that was required by the contract. Our attention has been called to no evidence whatever of any lack of diligence upon the part of respondents, or their sublessees, in drilling the second well, until the time drilling

operations were abandoned. The court found this was in June, 1927. This finding is not questioned and in the absence of any showing, we must assume it to be supported by the evidence. No possible claim of damage could then arise until after that date. ██ The evidence further shows that a quitclaim deed conveying the land back to appellants was executed on November 20, 1927, and recorded February 24, 1928. Under the clause of the contract permitting the lessee to quitclaim the real property the lessee was under no obligation to continue the drilling. (*Dabney* v. *Key,* 57 Cal. App. 762 [207 Pac. 921] ; *Sheehan* v. *Vedder,* 108 Cal. App, 419 [292 Pac. 175].) ██ Any possible claim for damages after the work was abandoned could only be based upon the delay of the respondents in quitclaiming the property. Appellants call our attention to section 1055 of the Civil Code, which provides "A grant duly executed is presumed to have been delivered at its date". It would therefore appear that the work was abandoned in June and the quitclaim deed was not delivered until November. However, no such theory is set up in the complaints, these being based upon the other theory, that the well should have been completed around December 1, 1926. Even if the theory of delay in quitclaiming the property was properly before us, no evidence appears to show that any such quitclaims were ever demanded by the appellants, or refused by the respondents. It would appear that appellants should have at least re-entered the property and minimized the damage. Upon the abandoning of the work the appellants had a right of re-entry to the property. (*Acme Oil & Min. Co.* v. *Williams,* 140 Cal. 681 [74 Pac. 296] ; *Brookshire* v. *Casmalia Co.,* 156 Cal. 211 [103 Pac. 927] ; *Taylor* v. *Hamilton,* 194 Cal. 768 [230 Pac. 656].) In addition, the court found that no damage had been suffered by appellants. If such evidence of damage as is pointed out could be considered, the record is devoid of any evidence from which it could be told what part thereof arose after June, 1927, up to which time defendants were within their rights under the contract so far as shown by the record. The only evidence as to damage set forth relates to the amount of production in other wells, which, in itself, is somewhat remote and speculative. (*Escondido Oil Co.* v. *Glaser,* 144 Cal. 494 [77 Pac. 1040] ; *McComber* v. *Kellerman,* 162 Cal. 749 [124

Pac. 431]; *Allen* v. *Narver*, 178 Cal. 202 [172 Pac. 980].) The showing made as to the insufficiency of the evidence to sustain this finding, is not sufficient to set the same aside.

In the second cause of action it is alleged that the sublease to one Cather, which is above referred to, was executed on July 22, 1926, prior to the time the leases here in question were signed by the plaintiffs. It is further alleged that this sublease provided that the said Cather would pay to the defendants $2,500 for the location, and also that the said lease contained the following provision: "It being impossible to estimate the damages for failure to drill the two wells, as described herein, it is agreed by and between the parties that if Lessee fails to drill the well on the part or portion of Lots 19 and 21 more fully described herein, then Lessee shall pay $5000 in oil out of the first well drilled on Lots 2 and 4, Block 218, as provided herein, payable out of 25% of Lessee's share of production."

It is alleged that this sublease was concealed from the plaintiffs, and that at all times in question the defendants were trustees for the plaintiffs, and as such were bound to reveal to them the terms of the Cather sublease, and the prayer is for $7,500 damages for the withholding of information concerning the same. The complaint neither alleges any facts showing the existence of such a trusteeship, nor does the record show any proof of such a relation. There is no proof that such information was suppressed or withheld, other than the fact that the appellants testified that they knew nothing of the sublease. No reason appears either from the complaint or the evidence why the respondents were in duty bound to inform appellants of this lease. Nothing is pointed out to show that the court's finding that the defendants did not wilfully or otherwise conceal the existence of this sublease from the plaintiffs, is not supported by the evidence. The fifth cause of action covers the same matter, but alleges that the defendants, as trustees for the plaintiffs, received $7,500 from Cather, for which they have failed to account. While the evidence shows that respondents received $5,000 under the terms of the Cather sublease, there are neither sufficient facts alleged in the complaint to show such a trusteeship, nor evidence to support such allegations, had they been made.

The third cause of action is based upon the theory that the respondents induced the appellants to enter into these leases by stating that the terms thereof were as favorable as could be obtained from any responsible parties, which statement is shown to have been false and fraudulent by the fact that they then had a sublease with Cather, upon more favorable terms. It is also charged that the only object of defendants was to collect the penalty from Cather, and that they had no intention of drilling upon plaintiffs' property. Aside from other considerations, no evidence is called to our attention to support such allegations. Even if the respondents had already entered into the Cather sublease at the time (the court found to the contrary) it by no means follows that appellants could have secured a similar lease, especially if they were unable to furnish power, to offset the lack of room for a power plant upon the property.

For reasons given, the judgment is affirmed.

Marks, Acting P. J., and Warmer, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 20, 1930, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 22, 1931.